UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY AND DEERBROOK INSURANCE COMPANY, | Civil Action No. 1:11-cv-06364-CBA-RML |

*Plaintiffs*,

vs.

GERARD M. TANELLA, GREGORY
SPEKTOR, INNA LYUBRONETSKAYA,
GERARD M. TANELLA, ATTORNEY AT
LAW, P.C. AND PROFESSIONAL BILLING
SERVICES,

*Defendants*.

## PLAINTIFFS' OPPOSITION TO DEFENDANT GREGORY SPEKTOR'S MOTION TO DISMISS

The plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Deerbrook Insurance Company (collectively, "Allstate" and/or "plaintiffs"), submit the within opposition to defendant, Gregory Spektor's ("Spektor"), Motion to Dismiss (Docket No. 24). For all the following reasons, Allstate respectfully requests an Order **DENYING** Spektor's motion to dismiss.

## I.   **RELEVANT PROCEDURAL HISTORY**

On December 30, 2011, Allstate filed a Complaint against Gregory Spektor ("Spektor"), Gerard M. Tanella ("Tanella"), Inna Lyubronetskaya ("Lyubronetskaya"), Gerard M. Tanella, Attorney at Law, P.C. ("PC Defendant"), and Professional Billing Services ("Professional Billing") (collectively, "defendants"). *See* Complaint ("C.") at Docket No. 1. In the Complaint, Allstate alleges that lawyer-for-hire Tanella, working in concert with Spektor, unlicensed layperson

1

Lyubronetskaya, and their unincorporated professional service firm, Professional Billing (collectively, the "Management Defendants"), engaged in a scheme to defraud Allstate by misrepresenting the true ownership and control of the PC Defendant.

In particular, Spektor conspired with Tanella, Lyubronetskaya, Professional Billing, and the PC Defendant, to wrongfully collect payments from Allstate for statutory attorney's fees in connection with No-Fault litigation. Spektor and his co-conspirators' objectives were accomplished by: (1) fraudulently incorporating the PC Defendant; (2) misrepresenting and/or concealing from Allstate (and the general public) that the PC Defendant was actually, owned, operated, and controlled by Spektor, Lyubronetskaya, and Professional Billing (i.e., the Management Defendants); (3) submitting false legal documentation—specifically, stipulations of settlement and other legal documents mailed for the purpose of obtaining payment for legal services rendered in connection with No-Fault litigation—representing that the PC Defendant was owned and controlled in accordance with New York law when, in fact, the law firm was fraudulently incorporated and therefore ineligible to receive payments for statutory attorney's fees; and (4) engaging in unlawful fee-splitting with at least one non-licensed layperson.

On April 16, 2012, Spektor moved to dismiss Allstate's Complaint. *See* Docket No. 24. The crux of Spektor's motion to dismiss is as follows: Allstate's Complaint (1) fails to establish proximate causation in connection with its RICO claims, (2) fails to allege attorney fee payments prior to Spektor's admission to the New York Bar, and (3) fails to plead fraud with particularity. As explained below, Spektor's motion should be denied.

## II.  SPECIFIC ALLEGATIONS OF WRONGDOING

### A.  OVERVIEW OF DEFENDANTS' FRAUDULENT CONDUCT

The defendants engaged in a "lawyer-in-the-box" fraud scheme,[1] wherein Spektor and

Lyubronetskaya (an unlicensed layperson) conspired and agreed to utilize the law license of Tanella

to operate the PC Defendant in violation of New York law.  Although Tanella purported to be the

sole owner, officer, and shareholder of the Tanella PC, the PC Defendant was, in reality, operated

and controlled by the Management Defendants, at least one of whom was an unlicensed layperson.

*See* C. ¶¶ 11-47, 73-89.  To circumvent New York law, the Management Defendants entered into a

secret scheme with Tanella in which they "purchased" his law license, and paid him to act as the

nominal "paper owner" of the PC Defendant.  Pursuant to this scheme, Tanella agreed to establish

the law firm at a location owned by Lyubronetskaya, and further agreed to cede control of his law

practice to the Management Defendants.  The PC Defendant was then used as a conduit to collect

statutory attorney's fees for legal representation in connection with No-Fault litigation, even though

the PC Defendant was, in reality, impermissibly owned and/or controlled by the Management

Defendants.[2]  *See* C. at ¶¶ 92-123.  From at least August 2007 through the present, true ownership

and control of the PC Defendant has rested entirely with the Management Defendants, who used the

façade of the PC Defendant to do indirectly what they were forbidden from doing directly: (1)

---

[1] In a "lawyer-in-the-box" scheme, a properly licensed attorney is held out to the public as the owner of the law firm, but the true owner(s), who is not licensed to practice law, actually controls the corporation and receives the revenues.  This type of scheme is analogous to a "doc-in-the-box" scheme, which constitutes the "corporate practice of medicine."  *Allstate Ins. Co. v. Valley Phys. Med. & Rehab., P.C.*, 475 F. Supp. 2d 213, 231 (E.D.N.Y. 1997) (finding that "the unlicensed owner...often attempts unlawfully to control the corporation").

[2] New York's Business Corporation laws provide that "no professional service corporation may render professional services except through individuals authorized by law to render such professional services to individuals."  *See* N.Y. Bus. Corp. § 1504.  Section 1507 of the Business Corporation Law of New York prohibits a PC from issuing shares, entering into agreement, or transferring control to individuals who are not authorized by law to practice the profession in which the professional corporation is authorized to practice.  Pursuant to Section 1508, no individual may be a director or officer of a law firm unless he or she is authorized by law to practice law in the State of New York.  Further, according to New York's Code of Professional Responsibility, Disciplinary Rule ("DR") 1-107, a lawyer may enter into interprofessional relationships for the systematic and continuing provision of legal and non-legal professional services only if the non-legal professional or non-legal professional service firm does not own, control, supervise, or manage—directly or indirectly—in whole or in part, the practice of law by the lawyer or the law firm.

employing an attorney; (2) controlling his practice; and (3) charging for (and deriving an economic benefit from) his legal services. *See id.* As part of the scheme, Tanella permitted the Management Defendants to exercise total control over the PC Defendant, including the statutory attorney's fees collected pursuant to New York law. Because the PC Defendant was, at all relevant times, (1) fraudulently incorporated, (2) used as a conduit to illegally split fees with at least one non-licensed layperson, and (3) owned or controlled by at least one unlicensed person, it was ineligible to pursue and collect attorney's fees for legal services rendered in connection with No-Fault litigation. *See id.*

### B.   SPECIFIC FACTUAL ALLEGATIONS REGARDING SHAM OWNERSHIP OF TANELLA PC

At all relevant times, Tanella was merely the "paper owner" of the PC Defendant, and had no substantive control over, or knowledge of, material aspects of the law firm's business operations. For instance, Tanella never: (1) played any role in the day-to-day operation and management of the law firm; and (2) managed the law firm's accounting matters (escrow account, operating account, books or records). The defendants' plan was designed to allow the Management Defendants to act as puppeteers, whereby they directed Tanella to conduct No-Fault litigation to recover payments on behalf of healthcare providers whose patients were automobile accident victims. In sum, Spektor and his co-conspirators' conduct rendered the PC Defendant ineligible to retain the statutory attorney's fees collected from Allstate in connection with No-Fault litigation claims and settlements.

### 1.   The Grievance Committee's May 2011 Decision & Order Evidences Defendants' Illegal Incorporation and Operation of Gerard M. Tanella, Attorney at Law, P.C.

The Grievance Committee for the Second, Eleventh, and Thirteenth Judicial Districts ("Grievance Committee") commenced an investigation of Tanella and his law firm in response to numerous complaints filed against Tanella alleging that he neglected his cases, misrepresented his clients and engaged in fraud. *See In the Matter of Gerard M. Tanella*, No. 2010-11445 (N.Y. Sup.

Ct., 2d Dept., May 12, 2011), annexed hereto at Exhibit 1.[3]  On May 12, 2011, based on substantial

admissions Tanella made under oath, along with other uncontroverted evidence of professional

misconduct, the Grievance Committee suspended Tanella from the practice of law.  In addition to

finding multiple instances of legal malpractice, the Grievance Committee also found that ***Tanella***

***ceded control of his law firm to non-lawyers***.  *See id.* at p. 1.

Specifically, the Grievance Committee found that, in or around August, 2007, Tanella

entered into an illicit agreement with Spektor, Lyubronetskaya, and Professional Billing to relocate

his law practice to the same building location (293 Avenue S, Brooklyn, New York) as Professional

Billing, and to act as the PC Defendant's "paper owner."[4]  *Id.*  At the time Spektor entered into the

agreement with Tanella and Lyubronetskaya, Spektor was not licensed to practice law in New York.[5]

Nonetheless, in furtherance of the defendants' scheme, Spektor—together with Lyubronetskaya and

Professional Billing—assumed day-to-day control over Tanella's law practice.  After Spektor

obtained his license to practice law in the State of New York, he continued to conspire with, and

allow, Lyubronetskaya (an unlicensed layperson) to exercise complete control over the law firm's

business operations.[6]  At the same time, the Management Defendants also assumed control over the

---

[3] In general, the reasoning behind the prohibition on the corporate practice of learned professions is aimed at preventing unlicensed persons from interfering with or influencing a licensed practitioner's professional judgment. This policy goal is applicable here—licensed attorneys should not be permitted to cede control of their practices to non-licensed laypersons.  In this case, when Tanella ceded control of his law practice to the non-licensed managers, he abandoned his professional and ethical duties to his clients, and became subservient to his management defendant masters.  This is exactly the type of conduct the "corporate practice" prohibition is meant to prevent.

[4] According to Tanella, Lyubronetskaya was the owner of the building that housed Tanella's law firm and Professional Billing.

[5] Spektor was not licensed to practice law in New York until November 2007.

[6] Although Spektor claims to be a licensed attorney during the relevant damage period identified in the Complaint, he violated New York law (at all times) by (1) conspiring with an attorney (Tanella) and a layperson (Lyubronetskaya) to allow lay ownership of a law firm, and (2) splitting legal fees with a non-lawyer (Lyubronetskaya).

law firm's escrow and operating accounts, as well as the law practice's financial books and records.[7] Indeed, Tanella admitted that he kept no ledger book or similar records of deposits into and withdrawals from his escrow account. *Id.*; *see also* C. at ¶ 79. During this time, Lyubronetskaya issued checks on Tanella's escrow and operating accounts using a stamp bearing Tanella's signature. *Id.*

At the direction of Spektor and Lyubronetskaya, Tanella conducted No-Fault collection litigation against insurers on behalf of medical providers, and was nothing more than a salaried employee of his own law practice. All control of the law firm's practice rested with Spektor and Lyubronetskaya. Upon the successful resolution of No-Fault cases, attorney's fees awarded to Tanella were deposited into the law practice's operating account. Tanella testified that Lyubronetskaya did not write checks from the law firm's operating account; however, Lyubronetskaya routinely issued checks against said attorney's fees to the order of herself and/or Professional Billing on behalf of Spektor. *Id.*

Since 2007, Professional Billing has been used as a tool to illegally: (1) own and control the PC Defendant; and (2) divert revenues generated by the law firm through stipulations of settlement submitted to Allstate for attorney's fees received in connection with No-Fault litigation. Between August 2007 and May 2010, Lyubronetskaya issued checks to herself and Professional Billing, comprised of the attorney's fees awards collected through No-Fault litigation. Upon information and belief, these monies—which comprised of the attorney's fees awards collected by the law practice as the result of No-Fault litigation—were then used to compensate Spektor and Lyubronetskaya (a non-lawyer) for their services rendered to the law firm. After Spektor was admitted to practice law in

---

[7] At all relevant times, Lyubronetskaya was never a licensed legal professional or certified public accountant. Further, upon information and belief, Professional Billing is not a New York professional service corporation authorized to provide accounting/billing services. Since Professional Billing is not a duly-formed professional service corporation under the laws of New York, it is not permitted to enter into any contractual relationship with a law firm pursuant to DR 1-107.

November 2007, he continued to illegally split fees with Lyubronetskaya, an unlicensed layperson, through at least May 2010. *Id.*

## 2.   Specific Allegations of Wrongdoing Against Spektor

At all relevant times, Spektor was the orchestrator of, and mastermind behind, the defendants' fraud scheme. In this capacity, Spektor partnered with unlicensed business person, Lyubronetskaya, to perpetrate a fraud scheme against insurance companies, including Allstate. *See* C. at ¶¶ 1-5, 90-92. In August 2007, Spektor (who was not yet licensed to practice law in New York) and his business partner, Lyubronetskaya, contrived a "lawyer-in-the-box" scheme using Tanella's law license to operate a law practice in violation of New York law. *See id.* at ¶¶ 1-5, 90-123.

In exchange for a salary, Tanella "sold" his law license to Spektor and Lyubronetskaya, and further agreed to establish his law practice in the same building location (293 Avenue S, Brooklyn, New York) as Professional Billing. *See id.* at ¶¶ 93, 102-03. As part of their business arrangement, Tanella ceded complete control of the law firm to Spektor and Lyubronetskaya. *See id.* at ¶¶ 94, 104-05. Despite the fact that Spektor was not licensed to practice law, Spektor—together with Lyubronetskaya and Professional Billing—assumed day-to-day control over Tanella's law practice. *See id.* at ¶¶ 83-85, 95-98, 105-23. Unlicensed laypersons, Spektor and Lyubronetskaya, were responsible for all material aspects of the PC Defendant's business operations and financial affairs. *See id.* Indeed, pursuant to the agreement, the Management Defendants: (1) controlled or maintained the PC Defendant's accounts, corporate books and records; (2) selected, directed and/or controlled the individuals or entities that were responsible for handling the PC Defendant's business affairs, including the collection of unpaid attorney's fees; and (3) hired or supervised the PC Defendant's employees. *See id.* at ¶¶ 83-85, 95-98, 112-116. Throughout the course of his relationship with the Management Defendants, Tanella exercised no substantive control over the PC Defendant. *See id.* All decision-making authority relating to the operation and management of the law firm had been vested exclusively with Spektor, Lyubronetskaya, and Professional Billing. *See id.* at ¶ 95.

Spektor argues that Allstate's claims should be precluded because Spektor was admitted to practice law in the State of New York prior to any of the dates of the payments that Allstate made to the Tanella Law Firm. *See* Docket No. 25 at pp. 4-5. However, contrary to Spektor's assertion, his status as an attorney is immaterial to Allstate's RICO analysis. The moving defendant's argument overlooks his involvement in the defendants' conspiracy, and his repeated conduct of dividing fees with a non-lawyer. *See id.* at ¶¶ 94-101, 102-23. As discussed above, even after Spektor was admitted to the New York bar, he continued to illegally split attorney's fees with his unlicensed business partner, Lyubronetskaya, and use the fraudulently-incorporated law firm as a vehicle to collect attorney's fees from Allstate. *See id.* Even though Spektor's professional status changed during the relevant period, his involvement in the defendants' conspiracy remained exactly the same. Thus, Spektor is liable for the injury caused to Allstate.

## III.    STANDARD OF REVIEW

### A.    FED. R. CIV. P. 12(B)(6)

On a motion to dismiss, a district court should assess the legal sufficiency of the complaint rather than weigh the evidence that might be presented at trial. *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir. 1985). The court must construe all well-pleaded allegations in the light most favorable to the plaintiff and accept the factual allegations as true. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 249-50 (1989). Although a complaint need not contain "detailed factual allegations" to survive a motion to dismiss, it must allege "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). In deciding a motion to dismiss, the Court "accept[s] as true all factual statements alleged in the complaint and draw[s] all reasonable inferences in favor of the plaintiff." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007); *see Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 347 (2d Cir. 2003).

The complaint must provide "'plausible grounds' for the allegations with 'enough facts to raise a reasonable expectation that discovery will reveal evidence' to support them." *Mazzaro de*

*Abreu v. Bank of Am. Corp.*, 525 F. Supp. 2d 381, 386 (S.D.N.Y. 2007) (quoting *Twombly*, 550 U.S. at 555). The issue is not "whether a plaintiff is likely ultimately to prevail, but whether the claimant is entitled to offer evidence to support the claims." *State Farm Mut. Auto Ins. Co. v. CPT Med. Servs., P.C.*, 2008 U.S. Dist. LEXIS 71156, *17 (E.D.N.Y. Sept. 3, 2008) (Glasser, J.) (denying defendants' motions to dismiss complaint).

## IV. ALLSTATE HAS SET FORTH LEGALLY COGNIZABLE CLAIMS FOR RELIEF AGAINST SPEKTOR

### A. ALLSTATE'S COMPLAINT CONTAINS WELL-PLED ALLEGATIONS OF MAIL FRAUD

#### 1. Spektor Fundamentally Misunderstands Allstate's Predicate Act Allegations

Spektor claims that Allstate's Complaint fails to state any claim for recovery whereas the only allegation of impropriety is that "the [legal] fees, once paid [by Allstate], were split among non-lawyers." *See* Docket No. 25 at p. 2. This argument is utterly false, and underscores Spektor's lack of understanding of the RICO statute. In his motion to dismiss, Spektor characterizes the "gravamen" of Allstate's Complaint as the act of illegal fee-splitting with non-lawyers. In doing so, Spektor attempts to recast Allstate's allegations by arguing for the preclusion of Allstate's RICO counts because illegal fee-splitting does not constitute one of RICO's enumerated predicate acts. Such a self-serving misrepresentation of Allstate's Complaint masks the crux of Allstate's RICO allegations by focusing on conduct that was incidental to the defendants' billing scheme, and ignoring the wrongful conduct that necessarily caused Allstate's injury.

Spektor, in concert with his co-conspirators, acted intentionally to collect monies from Allstate to which they were not entitled. As alleged in the Complaint, Spektor entered into an illicit agreement with Tanella and others whereby Tanella ceded control of the PC Defendant to Spektor and Lyubronetskaya—persons not licensed to practice law, nor authorized to own or operate a professional service corporation. During the initial phase of the conspiracy, Spektor (who was not yet licensed to practice law) and unlicensed layperson Lyubronetskaya exercised complete dominion

and control over all material aspects of the law firm's business operations and financial affairs. After Spektor obtained his license to practice law in the State of New York, he continued to conspire with Lyubronetskaya and Tanella to actively conceal the true ownership and control of the PC Defendant. At all relevant times, Spektor knew that Lyubronetskaya was never licensed to practice law and, as such, was not permitted to own a law firm or participate in its corporate affairs.

In furtherance of their scheme, the defendants mailed documents to Allstate that misrepresented the true ownership and control of the PC Defendant and, in doing so, also misrepresented the PC Defendant's eligibility to collect attorney's fees in connection with No-Fault litigation. These mailings—specifically, stipulations of settlement and other legal documentation mailed for the purpose of obtaining settlement proceeds (a portion of which would be used to reimburse the defendants for legal services rendered to the healthcare providers)—submitted by the PC Defendant, and purportedly signed by Tanella, represented that Tanella was the sole owner of the law firm when, in reality, true ownership and control of the PC Defendant had been vested with at least one non-licensed layperson. The submission of these facially-valid documents to Allstate was designed to, and did, in fact, induce Allstate to rely on the accuracy of such mailings. As a direct result of the defendants' fraudulent conduct, Allstate paid more than $44,250.00 in attorney's fees that the PC Defendant was not entitled to, due to its illegal ownership and control by the Management Defendants.

Allstate seeks the recovery of monies paid to the defendants in reliance on the defendants' statements that they were entitled to receive attorney's fees under New York law. If the defendants were not entitled to receive payments at the time the demands were made, then the defendants' statements warranting such eligibility are misrepresentations of material fact. In the RICO context, if the defendants were operating the PC Defendant in violation of New York law, and were not eligible to collect attorney's fees, then any representations to the contrary are false. Allstate alleges that the

defendants used the mails to submit numerous documents to Allstate warranting that the defendants were eligible to receive reimbursement from Allstate when, in reality, they were not.

Thus, Spektor's assertion that Allstate failed to properly allege a RICO "predicate act" is completely without merit. Here, Allstate alleges that Spektor and his co-conspirators violated 18 U.S.C. § 1341 by mailing to Allstate documents that falsely warranted that the PC Defendant was operated in accordance with New York's No-Fault laws. The defendants' pursuit of payment from Allstate—while operating in violation of New York law—violated 18 U.S.C. § 1341, thus giving rise to liability under 18 U.S.C. § 1962(c). Further, the conduct that serves as the foundation for Allstate's RICO claims (i.e., material misrepresentations regarding the PC Defendant's eligibility to receive No-Fault payments) also supports Allstate's state law claims against the defendants. As such, Allstate has stated legally sufficient claims for recovery, and the moving defendant's motion to dismiss should be denied.

**2.   Allstate's Claims Are Not Precluded by the Dates of Allstate's Payments to the PC Defendant**

Spektor argues that Allstate's claims should be precluded because Spektor was admitted to practice law in the State of New York "prior to any of the dates of the payments that Allstate made to the Tanella Law Firm." *See* Docket No. 25, at p. 3. As discussed above, Allstate's fraud-based claims are not predicated upon the date of Spektor's admission to the New York Bar. Rather, the foundation for Allstate's claims is based on the fraudulent incorporation and operation of the PC Defendant, and the defendants' subsequent creation and submission of false legal documentation misrepresenting the true ownership of the law firm and its eligibility to seek and retain attorney's fees. Therefore, Spektor's argument that Allstate's claims are precluded—based on when, and to whom, the payments were made—is not dispositive of Allstate's RICO claims.

Spektor contends that he never violated any professional disciplinary rules because, as an admitted attorney, he was allowed to split fees with other lawyers. Spektor's argument, however,

fails to consider his conduct as it relates to Lyubronetskaya. Although Spektor *may* have been authorized to share legal fees with Tanella after receiving his New York law license, Spektor was never authorized to split fees with Lyubronetskaya, and was never lawfully entitled to use the fraudulently-incorporated law firm as a vehicle to collect attorney's fees from Allstate—fees that would not have otherwise been paid if the defendants' disclosed the true ownership and control of the law firm.

Spektor's professional status may have changed during the relevant period, but the defendants' conspiracy and scheme (and Spektor's involvement thereof) remained exactly the same. When Spektor entered into the agreement with Tanella, Lyubronetskaya and Professional Billing, he was not yet licensed to practice law in New York and, as such, was legally prohibited from controlling the PC Defendant's business operations, and retaining payments from Allstate for legal services rendered in connection with No-Fault litigation. A portion of these illegally-obtained payments were then used to reimburse Spektor for "management services" purportedly provided by his management company, Professional Billing. Spektor's admission to the New York bar did not extinguish his liability to Allstate. From November 2007 through May 2010, Spektor continued to split fees with Lyubronetskaya, an unlicensed layperson, and knowingly allowed (and facilitated) Lyubronetskaya's unauthorized exercise of control over the law firm's business operations and financial affairs. Further, Spektor continued to utilize both the PC Defendant and Professional Billing as conduits to (1) collect statutory attorney's fees for legal services rendered in connection with No-Fault litigation (fees that Allstate would not have otherwise paid had the defendants been forthcoming about the true ownership and control of the law firm), and (2) illegally divert revenues generated by the law firm to facilitate the division of fees with Lyubronetskaya, a non-lawyer.

**B.**     <u>**ALLSTATE HAS STATED A VIABLE CLAIM UNDER 18 U.S.C. § 1962(c)**</u>

To state a claim under RICO in the Second Circuit, a plaintiff must establish that (1) the defendant; (2) through the commission of two or more "predicate" acts; (3) constituting a pattern; (4)

of racketeering activity; (5) directly or indirectly participates; (6) in an enterprise; (7) the activities of which affect interstate commerce. *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d. Cir. 1993) (citing 18 §§ U.S.C. 1962(a) – (c)).  A plaintiff must also allege "causation," (i.e., that he or she was injured in his or her business or property by reason of a violation of § 1962). *Id.*  The defendants' fraudulent conduct fits squarely within the parameters of the federal RICO statute.  Accordingly, this Court should disregard Spektor's claim that Allstate's fraud claims cannot be addressed under the RICO statute.

### 1.    Allstate's Has Established a Pattern of Racketeering Activity

The pattern element of a properly pled RICO Complaint requires two acts of racketeering activity within a ten-year period. 18 U.S.C. § 1161(5).  The RICO statutory scheme defines "racketeering activity" to include a host of criminal offenses, which are in turn defined by federal and state law. *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 242 (2d Cir. 1999). Specifically, the RICO statute defines "racketeering activity" as any act which amounts to a violation of the criminal statutes set forth at 18 U.S.C. § 1961(1), including mail fraud or aiding and abetting mail fraud under 18 U.S.C. §1341. *See City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 446 (2d Cir. 2008) ("Mail fraud and wire fraud are forms of 'racketeering activity' for the purposes of RICO").

Spektor contends that Allstate's RICO claims must be dismissed because Allstate has failed to allege predicate acts sufficient to establish a pattern of racketeering activity required under RICO. Specifically, Spektor asserts that there is no allegation made in Allstate's Complaint that (1) the amount of legal fees charged was in any way improper, (2) the health care providers were ineligible to receive payment from Allstate, or (3) the health care providers rendered fraudulent care to patients/Allstate insureds.  Spektor also attempts to distinguish this case from prevailing authority in this jurisdiction.  Spektor contends that Allstate's RICO claims should fail because, unlike other cases where "Allstate ha[d] been found by Courts in this District to have adequately pleaded RICO

13

violations," here, "there is no allegation that the services for which the clients of the Tanella Law Firm sought payment were fraudulent or in any way not legitimate." *See* Docket No. 25 at p. 8. Spektor's argument blatantly ignores this Court's prior decisions holding that a plaintiff need not seek recovery for fraudulent services to state a claim for recovery under the RICO statute. *See AIU Ins. Co. v. Olmecs Med. Supply, Inc.*, 2005 U.S. Dist. LEXIS 29666 (E.D.N.Y. Feb. 22, 2005) (finding allegations regarding fraudulent misrepresentations of fact sufficient for maintaining cause of action under Fed. R. Civ. P. 12(b)(6)); *Allstate Ins. Co. v. Rozenberg*, 590 F. Supp. 2d 384 (E.D.N.Y. 2008) (same); *Allstate Ins. Co. v. Halima*, 2009 U.S. Dist. LEXIS 22443 (E.D.N.Y. Mar. 19, 2009) (same); *Allstate Ins. Co. v. Valley Physical Med. & Rehab., P.C.*, 2009 U.S. Dist. LEXIS 91291 (E.D.N.Y. Sept. 30, 2009) (same); *State Farm Mut. Auto. Ins. Co. v. Grafman,* 655 F. Supp. 2d 212, 220 (E.D.N.Y. 2009) (same); *Allstate Ins. Co. v. Etienne*, 2010 U.S. Dist. LEXIS 113995 (E.D.N.Y. Oct. 22, 2010) (same); *State Farm Mut. Auto. Ins. Co. v. Rabiner*, 749 F. Supp. 2d 94 (E.D.N.Y. 2010) (same); *Allstate Ins. Co. v. Bogoraz*, 2011 U.S. Dist. LEXIS 63721 (E.D.N.Y. June 10, 2011) (same).

Each of these decisions makes it clear that Allstate need not plead allegations of fraudulent services to state a claim for recovery. *See Rozenberg*, 590 F. Supp. 2d 384. Rather, Allstate is only required to allege with specificity that the defendants' representations were fraudulent because they were not legally entitled to receive payment. Thus, the actual propriety of any underlying medical or legal services is irrelevant to the determination of the sufficiency of Allstate's allegations under Rule 12(b)(6) in this case. *See Olmecs Med. Supply, Inc.*, 2005 U.S. Dist. LEXIS 29666 (finding allegations regarding fraudulent misrepresentations of fact sufficient for maintaining cause of action under Fed. R. Civ. P. 12(b)(6); *Bogoraz*, 2011 U.S. Dist. LEXIS 63721 (same). Here, the Complaint alleges that the Management Defendants, working in concert with Tanella, exercised sole control over the operation of the PC Defendant. *See* C. at ¶¶ 11-47, 73-89, 92-123. Allstate further alleges that the defendants—including Spektor—created and mailed false legal documentation containing

misrepresentations regarding the PC Defendant's eligibility to collect attorney's fees. In reasonable reliance on the defendants' statements, Allstate made substantial payments to the defendants. *See id.* Accordingly, Allstate has pled legally cognizable claims, and thus the moving defendant's motion to dismiss should be denied.

Moreover, Spektor continually (and erroneously) characterizes the act of illegal fee splitting with non-lawyers as the gravamen of Allstate's predicate act. *See* Docket No. 25 at p. 6. However, as discussed above, Allstate's RICO claims are based on the illegal ownership and control of the PC Defendant, and the repeated representations made to Allstate—using the U.S. Mail—regarding the law firm's compliance with New York law (representations that were transmitted to Allstate thorough the U.S. Mail), and not the act of illegal fee-splitting itself.[8]

      a.    Allstate's Allegations of Mail Fraud Are Sufficient to Establish a Pattern of "Racketeering Activity"

To demonstrate mail fraud, a plaintiff must prove "(1) the existence of a scheme to defraud, (2) the defendant's knowing or intentional participation in the scheme and (3) the use of interstate mails…in furtherance of the scheme." *In re Crazy Eddie Sec. Litig.*, 812 F. Supp. 338, 347 (E.D.N.Y. 1993); *Porcelli v. U.S.*, 2002 U.S. App. LEXIS 18776 (2d Cir. Sept. 13, 2002).

The second element requires a showing that it was foreseeable that mails would be used – not that the alleged defendant placed an item in the mail. *United States v. Maze*, 414 U.S. 395, 399 (1974). A plaintiff need not prove that each defendant personally used the postal system, but only that the defendant acted "with the knowledge that the use of the mails will follow in the ordinary course of business, or [acted in circumstances] where such use can be reasonably foreseen." *Id.* Nor does the plaintiff need to show that the defendant personally placed the communication into the postal system, *Schmuck v. United States*, 489 U.S. 705, 711-15 (1989), as the aim of the mail fraud statute is to punish the scheme to defraud, rather than the end result. *Sebago v. Beazer East, Inc.*, 18

---

[8] It is beyond debate that mailing false documents through the U.S. Mail constitutes an indictable offense.

F. Supp. 2d 70, 82 (D. Mass. 1998) (citing *United States v. Allard*, 926 F.2d 1237, 1242 (1st Cir. 1991)) (explaining that "[i]t is not necessary to establish that the intended victim was actually defrauded.").

Allstate alleges that the defendants mailed documents to Allstate that materially misrepresented: (1) the true ownership and control of the PC Defendant; and (2) the PC Defendant's eligibility to collect statutory attorney's fees. Specifically, the PC Defendant produced stipulations of settlement, and other documents mailed for the purpose of obtaining payment for legal services rendered to the healthcare providers, purportedly authored and executed by Tanella using a signature stamp that clearly reads "Gerard M. Tanella." These legal documents (which included the exact amount of attorney's fees) did not disclose the PC's relationship with either Spektor or Lyubronetskaya. These statements and omissions were material to the determination of whether the PC Defendant was eligible to receive attorney's fees. Had all material facts relevant to the PC's eligibility to receive reimbursement under the No-Fault laws been disclosed to Allstate (i.e., Lyubronetskaya's control over the PC), Allstate would not have made payments to the defendants. Thus, contrary to the Spektor's contention that Allstate's Complaint should be dismissed because it was "based solely on allegations of violations of professional disciplinary rules," Allstate's Complaint sufficiently pleads conduct that represents a clear violation of 18 U.S.C. § 1341 (mail fraud), and thus gives rise to Spektor's liability under 18 U.S.C. § 1962(c).

## 2. Spektor's Actions Directly and Proximately Caused Allstate's Injury

### a. Spektor's Arguments Regarding the Direct and Proximate Causes of Allstate's Injury Are Fatally Flawed

Spektor's arguments that (1) the law firm actually provided the legal services to healthcare providers in connection with No-Fault litigation, and thus Allstate was not harmed because it was obligated to pay the statutory attorney's fees, (2) the illegal act of splitting fees occurred after Allstate made the payments and, as such, the so-called "illegal conduct" perpetrated by Spektor and

16

his co-conspirators did not induce Allstate to make the payments, and therefore did not cause Allstate's injury, and (3) Allstate does not have standing to bring a RICO claim, based on the improper division of attorney's fees, because Allstate "is not a party that is protected by the Disciplinary Rules prohibiting the sharing of fees with non-attorneys," *see* Docket No. 25 at p. 7, do not provide a basis to dismiss Allstate's well-pled RICO allegations. All of Spektor's arguments fail because he ignores the predicate acts of mail fraud upon which Allstate's RICO claims are based. Despite Spektor's repeated attempts to recast Allstate's Complaint as one for "violation of disciplinary rules," Allstate's RICO claims are predicated on the mailing of false legal documentation. Accordingly, Allstate adequately alleges that the moving defendant engaged in a pattern of racketeering activity comprised of the predicate act of mail fraud (18 U.S.C. § 1961(1)(B)), which gives rise to the moving defendant's liability under 18 U.S.C. § 1962(c).

> b.   The Defendants' Racketeering Activity Was the Direct and Proximate Cause of Allstate's Injury

To satisfy the causation element under RICO, a plaintiff must allege that the defendant's violation was both a factual cause of plaintiff's injury, as well as the proximate cause of the injury. *Ideal Steel Supply Corp. v. Anza*, 254 F. Supp. 2d 464, 467-68 (S.D.N.Y. 2003) (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 265-68 (1992)). In cases where mail fraud is the predicate act which forms the basis for the plaintiff's RICO claim, a plaintiff must plead "loss causation" and "transaction causation." *Ideal Steel*, 254 F. Supp. 2d at 468. The burden of pleading loss causation is met upon the demonstration that the alleged misrepresentation constituted both an actual and proximate source of the loss that the plaintiff suffered. *Moore v. Painewebber, Inc.*, 189 F. 3d 165, 169-70 (2d Cir. 1999). A showing that the plaintiff relied on the defendant's misrepresentations establishes transaction causation. *Id.* at 171- 72.

Allstate has sufficiently alleged that it suffered harm as a direct and proximate result of the defendant's fraudulent representations. Spektor's participation in the act of submitting legal

documentation directly to Allstate on behalf of the PC Defendant (i.e., the "transaction"), caused Allstate, upon reasonable reliance on said false stipulations of settlement and other documentation, to pay attorney's fees in the amount of $44,250.00 that it was not otherwise obligated to pay.[9] *See* C. at ¶¶ 124-39. Based upon the defendants' concerted affirmative acts of concealment, Allstate paid money to this illegally organized entity to its detriment—monies that Allstate otherwise would not have paid if Spektor, Tanella, Lyubronetskaya, Professional Billing, and the PC Defendant had provided true and accurate information. *See* C. at ¶¶ 124-39, 163-70, 176-86. As alleged in the Complaint, the defendants accomplished the fraudulent billing scheme through use of the U.S. Mail. *See* C. at ¶¶ 124- 32. Such conduct violates the federal mail fraud statute, 18 U.S.C. §1341, and constitutes the requisite predicate conduct under RICO. 18 U.S.C. §1961(1); C. at ¶¶ 141-62. Accordingly, Allstate has stated a claim under RICO, and Spektor's motion to dismiss must be denied.

        c.      The Adequacy of Allstate's Mail Fraud Allegations are Sufficient to Establish Proximate Cause Standing For Allstate

Spektor contends that, since Allstate is not "foreseeably within the ambit of people to be protected by the no-fee-splitting disciplinary rules," Allstate has no proximate cause standing to bring its RICO claims. *See* Docket No. 25 at p. 7. Specifically, Spektor alleges that, "without an allegation from which proximate cause directly linking a defendant's activities and plaintiff's actual injury can be inferred, a RICO claim must be dismissed." Spektor's argument is completely without merit. Because Allstate has satisfied the pleading requirements to allege a prime facie cause of action under RICO where mail fraud is the predicate act, Allstate has implicitly satisfied the *Holmes* proximate cause factors, and thus has established standing under civil RICO.

When considering whether the proximate cause element of RICO has been established, a court must closely consider the nature of the underlying predicate act. *Holmes*, 503 U.S. 258, 265-

---

[9] This amount represents all monies paid by Allstate to Defendants since December 2007, the exact amount to be determined at trial.

68. Due to the nature of the predicate acts alleged in its Complaint (i.e., mail fraud), Allstate's satisfaction of the pleading requirements necessary to state a cause of action for federal mail fraud necessarily satisfies the proximate cause test established under *Holmes*. Simply put, the same allegations that satisfy Allstate's pleading burden regarding RICO in this case also establish standing under *Holmes*. *See Ideal Steel*, 254 F. Supp. 2d 464 (in RICO case based upon mail fraud, finding that causation element of RICO requires a plaintiff to demonstrate that reliance on fraudulent misrepresentations caused injury); *Piccone v. Board of Dirs. of Doctors Hospital of Staten Island, Inc.*, 2000 U.S. Dist. LEXIS 12249, *14 (S.D.N.Y. Aug. 28, 2000); *Holmes*, 503 U.S. at 274 (holding that proximate cause analysis turns on the precise nature of the underlying wrongful conduct).

The fact that there may have been other targets or victims of the defendants' fraud scheme does not improve Spektor's position. Allstate was clearly the "reasonably foreseeable or anticipated" victim of Spektor's fraudulent scheme—after all, Spektor and his co-conspirators issued the mailing ***directly to Allstate*** demanding payment. *See Baisch v. Gallina*, 346 F.3d 366 (2d Cir. 2003) (holding that "[n]o precedent suggests that a racketeering enterprise may have only one 'target' or that only a primary target has standing"); *Summit Properties, Inc. v. Hoechst Celanese Corp.*, 214 F.3d 556, 559 (5th Cir. 2000) (construing *Holmes* to require RICO plaintiff to demonstrate reliance upon mailings alleged to have violated 18 U.S.C. §1341). The representations communicated by the defendants through the use of the mails were made with the intent to cause insurance companies to pay attorney's fees in connection with No-Fault collection litigation. *See id.* Allstate alleges that it relied on the representations made by the defendants in mailing payments to the defendants. *See C.* at ¶¶ 133-39. Allstate has articulated a direct injury arising from its reliance upon the defendants' fraudulent statements. *See id.*; *see also Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172 n.6 (2d Cir. 1999) (finding proximate cause sufficiently alleged, and noting, "[t]his does not mean that issues as to the extent or even existence of damages may not arise as litigation proceeds"). Because Allstate's allegations must be taken as true at the Rule 12(b)(6) stage (*see McCarthy v. Dun & Bradstreet*

*Corp.*, 482 F.3d 184, 191 (2d Cir. 2007)), this Court should conclude that Spektor's acts were a substantial factor in the sequence of causation, and that the injuries Allstate alleges arising from the defendants' scheme were "reasonably foreseeable or anticipated as a natural consequence" of the defendants' conduct. *See Baisch*, 346 F.3d at 374; *Lerner*, 318 F.3d at 123.

> d.    Application of *Holmes* Factors

A civil RICO plaintiff must allege "a direct relation between the injury asserted and the injurious conduct alleged." 503 U.S. at 268. The *Holmes* Court was concerned that "[a]llowing suits by those injured only indirectly would open the door to massive and complex damages litigation, which would not only burden the courts, but would also undermine the effectiveness of treble-damages suits." *Id.* at 274. Cautioning against a bright-line rule, the Court enumerated three factors for consideration in determining whether an injury is too indirect to confer standing under RICO:

> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

*Id.* at 269-270 (citations omitted).

> i.    *Allstate's Damages Are Directly Attributable to Defendants' Fraud*

The injury inflicted upon Allstate by the defendants is sufficiently direct to allow for a precise calculation of damages arising therefrom. The first *Holmes* factor concerns a court's ability to differentiate between (1) damages arising from the alleged wrongful conduct, and (2) damages caused by independent, intervening factors. *Id.* With respect to Allstate's direct payment to the

20

defendants, Allstate has alleged the precise damages emanating from these payments, and there are no intervening factors. *See* C. at ¶ 140; *see also* C. at Exhibit 3. Construing the allegations in a light most favorable to Allstate, damages have been adequately alleged to be the direct result of defendants' wrongful conduct.

ii.      *Avoidance of Complicated Apportionments*

Allstate's injury is distinct and independent from any other potential plaintiff. The success of the defendants' scheme depended upon insurers' reliance upon the documents submitted by the defendants in the course of seeking reimbursement under the No-Fault laws, specifically attorneys' fees. To the extent that defendants' conduct caused Allstate to make payments that it would not have otherwise made, Allstate is entitled to seek recovery from the wrongdoers, including Spektor. Allstate has articulated an injury arising from the payment of otherwise non-compensable attorney fee payments. The payment of these funds injured Allstate, and no one else. Likewise, the receipt of these payments benefited the defendants—and no other known individuals.

iii.      *There Are No Other Parties With Standing or Similar Motive*
*To Vindicate Allstate's Injury*

The third *Holmes* factor asks whether there are more directly injured victims who can be counted on to vindicate the law as private attorneys general. 503 U.S. at 269-270. Here, Allstate <u>alone</u> has standing to pursue a legal remedy for the direct injury it suffered at the hands of the defendants. Even assuming that there were other parties legally competent to pursue legal remedies for <u>Allstate's</u> injury, no such theoretical plaintiffs would be similarly motivated. Put simply, no one other than Allstate is in a position to sue to vindicate Allstate's injury. Unlike *Holmes,* there are no other "directly injured victims" who can be "counted on to vindicate the law as private attorneys general." 503 U.S. at 269-270. Allstate's injury arises from its reliance upon the misrepresentations made by defendants. There are no intermediaries involved in Allstate's case capable of alleging and/or proving detrimental reliance based upon representations made by defendants (much less that

21

defendants had the intent to defraud any such third party). Accordingly, Allstate's reliance upon defendants' alleged misrepresentations implicates fraud in a manner that was not present in *Holmes*. Allstate is the only plaintiff who can (1) allege a legally cognizable injury, and (2) allege that it relied to its detriment upon the misrepresentation intentionally made by the defendants. Consequently, there is no risk of multiple or overlapping recovery.

A close application of the *Holmes* factors to the precise nature of misconduct involved in this case—mail fraud-based RICO claims—effectuates the principles important to the Court in *Holmes*, and furthers the remedial nature of RICO's civil recovery provisions. Allstate's Complaint establishes that defendants intentionally violated the federal mail fraud statute with the intent to obtain money under false pretenses from Allstate, and that Allstate relied upon such false representations to its detriment. *See* C. at ¶¶ 124-92. The injury alleged by Allstate, if proven at trial, is sufficiently direct to satisfy the test enunciated in *Holmes*. Allstate has sufficiently alleged "a direct relation between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 208.

iv. *Relevant Persuasive Authority*

The decision in *Allstate Ins. Co. v. Seigel*, 312 F. Supp. 2d 260 (D. Conn. 2004) is instructive on this matter. In *Seigel*, the defendants sought dismissal of the plaintiffs' complaint, in part, because (defendants insisted) the predicate acts were not the cause of plaintiffs' alleged injuries, and plaintiffs' fraud claim failed to sufficiently allege causation. 312 F. Supp. 2d at 262. Analyzing the defendants' claims under *Holmes* (and its Second Circuit progeny), the *Seigel* court reasoned that plaintiffs were "the reasonably foreseeable and anticipated victim" of defendants' fraudulent acts. 312 F. Supp. 2d at 266 (reasoning "[i]ndeed, it is difficult to identify any other target or victim of [defendants'] fraudulent scheme than the insurers that paid damages or settlements based on his fraudulent medical reports and billings). In assessing the third *Holmes* factor (motive to vindicate rights), the court reasoned:

22

> Defendants assert that Seigel's tort victim patients will vindicate the law by suing Seigel for the fraudulent bills and medical diagnoses he made on their behalf. But for reasons stated previously, it is difficult to understand how those who actually benefitted (albeit unwittingly) from Seigel's fraud could sue him to recover amounts paid by Allstate that the tort victim patients were never entitled to receive in the first place. That is, wouldn't Seigel claim in such actions that the tort victim patients lacked standing to sue him because they were not injured by his conduct but actually benefitted from it? More to the point, however, it is difficult to understand *why* those tort victim patients would bother bringing such an action even if they could do so. The tort victims who recovered more than they were entitled to because of Seigel's fraudulent bills and medical reports are unlikely to band together to sue Seigel to recover amounts to which they are never entitled and which they would likely be required to pass along to Allstate by way of reimbursement.

*Id.* at 269.

On the issue of causation, the *Seigel* court concluded that the allegations demonstrated sufficient facts to seek RICO damages. The court reasoned that "at this stage of the litigation, the Court must accept Allstate's assertions as true[,]" and that the issues regarding the exact level of damage were "better addressed in the context of the traditional standards for recovery of damages rather than in the context of standing to pursue the claims at all." *Id.* at 268. In this matter, Allstate seeks to recover only those monies paid directly to the defendants in connection with statutory attorney fee awards. These amounts have been pleaded with precision. *See* C. at ¶ 140; *see also* C. at Exhibit 3. Accordingly, Allstate's Complaint establishes the causation required to state a RICO claim, thus Spektor's motion to dismiss Allstate's RICO claims should be denied.

### C.   ALLSTATE HAS STATED A VIABLE CLAIM UNDER 18 U.S.C. § 1962(d)

In addition to alleging a substantive RICO claim, Allstate also alleges a RICO conspiracy in violation of 18 U.S.C. § 1962(d). The Second Circuit has clearly acknowledged that the "core of a RICO civil conspiracy is an agreement to commit predicate acts." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990) (citing *Rose v. Bartle*, 871 F.2d 331, 336 (3d Cir. 1989)).

23

The complaint must allege that the defendant[s] "willfully participated in at least two...predicate offenses, that the predicate offenses constituted a pattern of racketeering activity, and that [the defendants] conspired to participate in the affairs of [the enterprises] by engaging in the predicate offenses." *United States v. Ruggiero*, 726 F.2d 913, 923 (2d Cir. 1984), *cert. denied sub. nom, Rabito v. United States*, 469 U.S. 831 (1984). The conspiracy must also "be inferred from circumstantial evidence of [the defendants'] status in the enterprises and [their] knowledge of the wrongdoing." *Morrow v. Black*, 742 F. Supp. 1199, 1208 (E.D.N.Y. 1990); *Cadle Co. v. Flanagan*, 271 F. Supp. 2d 379, 391 (D. Conn. 2003); *see also United States v. Rastelli*, 870 F.2d 822, 828 (2d Cir. 1989) (holding that "it is sufficient that the defendant know the general nature of the enterprise and know that the enterprise extends beyond his individual role").

Allstate's Complaint clearly alleges that Spektor, Lyubronetskaya and Professional Billing entered into an agreement with Tanella whereby Tanella agreed to relocate his law practice to the same office building as Professional Billing. Pursuant to this agreement, Tanella also agreed to surrender complete control of the law firm to Spektor and Lyubronetskaya in exchange for a designated salary. This agreement allowed Spektor to share in the proceeds generated by the PC Defendant, and further allowed Spektor to exert actual control over the business affairs of the PC Defendant. *See* C. at ¶¶ 73-123. Read together, Allstate's Complaint provides plausible grounds for Allstate's allegations that Tanella agreed to partner with Spektor, Lyubronetskaya and Professional Billing to operate the PC Defendant in violation of New York law. Accordingly, Allstate has established the existence of a RICO conspiracy in violation of 18 U.S.C. § 1962(d).

## D.  ALLSTATE'S COMPLAINT SATISFIES FED. R. CIV. P. 9(b)

Allstate demonstrates, with factual particularity, how Spektor conspired with Tanella and Lyubronetskaya to perpetrate their fraud scheme against Allstate. In addition, Allstate describes, with particularity, how Spektor associated with, and participated in, the wrongful conduct of the RICO enterprise, namely the operation of a professional service corporation in violation of New

24

York law. Allstate sufficiently demonstrates that Tanella relinquished control of the law firm to Spektor and Lyubronetskaya, a non-licensed layperson. Further, Allstate details the defendants' creation and mailing of documents that contained material misrepresentations concerning the actual ownership and control of the PC Defendant. *See* C. at ¶¶ 124-92.

### 1.   Standard of Review: Fed. R. Civ. P. 9(b)

Fed. R. Civ. P. 9(b) requires that the circumstances constituting allegations of fraud be stated with particularity, but that malice, intent, knowledge, and other conditions of the mind may be averred generally. Fed. R. Civ. P. 9(b). This rule applies to RICO claims for which fraud is a predicate act. *Moore v. PaineWebber, Inc.*, 189 F.3d 169, 172 (2d Cir. 1999). "In the RICO context, Rule 9(b) calls for the complaint to specify the statements it claims were false and misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Id.* at 173; *see also International Telecom, Inc. v. Generavora Electrica del Oriente, S.A.*, 2002 U.S. Dist. LEXIS 5023 (S.D.N.Y. Mar. 27, 2002) (explaining that to survive scrutiny under Rule 9(b), fraud allegations generally should specify the time, place and content of an alleged misrepresentation.)

However, "[t]he Complaint in a RICO action need not be specific as to each allegation of mail or wire fraud when the nature of the RICO scheme is sufficiently pleaded so as to give notice to the defendants." *First Interregional Advisors Corp. v. Wolff*, 956 F. Supp. 480, 485 (S.D.N.Y. 1997) (citing *DiVittorio v. Equidyne Extractive Indus.*, 822 F.2d 1242, 1247 (2d Cir. 1987)).

> In cases in which the plaintiff claims that the mails or wires were simply used in furtherance of a master plan to defraud, the communications need not have contained false or misleading information themselves. *See Schmuck [v. United States]*, 489 U.S. [705] at 715 [(1989)]. In such cases, a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications, is sufficient to satisfy Rule 9(b). In complex civil RICO actions involving multiple defendants, therefore, Rule 9(b) does not require that temporal or geographic particulars of each

> mailing or wire transmission made in furtherance of the fraudulent scheme be stated with particularity. *Spira [v. Nick]*, 876 F. Supp. [553] at 559 [(1995)] In such cases, Rule 9(b) requires only that the plaintiff delineate, with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme. *Madanes v. Madanes*, 981 F. Supp. 241, 254 (S.D.N.Y. 1997); *Center Cadillac [v. Bank Leumi Trust Co.]*, 808 F. Supp. [213] at 229 [1992)]; *Beth Israel Med. Ctr. v. Smith*, 576 F. Supp. 1061, 1070-71 (S.D.N.Y. 1983).

*In Re: Sumitomo Copper Litigation,* 104 F. Supp. 2d 314, 320 (S.D.N.Y. 2000).

"This is especially true when the sufficiency of the complaint is being considered before discovery has taken place and when the information is exclusively in the possession of those participating in the fraud." *Wolff*, 956 F. Supp. at 485.

          a.    <u>Time</u>

Allstate's Complaint sufficiently alleges the period during which the defendants—including Spektor—advanced misrepresentations of material fact regarding the true ownership and control of the PC Defendant, and the PC Defendant's eligibility to collect statutory attorney's fees under New York law. *See* C. at ¶¶ 73-123. With respect to its RICO claims, Allstate's Complaint adequately notifies Spektor of the timing of the predicate acts (i.e., mail fraud)—the dates that the documents containing the misrepresentations were generated and submitted via the U.S. Mail. *See id.* at Exhibit 2. The period encompassed in Allstate's Complaint is 2007-2011. *See id.* (demonstrating dates on which Allstate made payments to the PC Defendant in reliance on defendants' misrepresentations regarding the law firm's eligibility to collect payments under New York's No-Fault laws).

          b.    <u>Place</u>

The location of the alleged fraudulent representations made by Spektor (and sufficient to put him on notice of the conduct alleged against him) has been specifically pled to have occurred at or near the PC Defendant's place(s) of business located in the State of New York. *See* C. at ¶¶ 19-22,

28-29, 92-93, 102. Thus, the location of the defendants' alleged fraudulent activities has been pled with particularity sufficient to meet the requirements under Fed. R. Civ. P. 9(b).

        c.    <u>Content</u>

The content of Spektor's fraudulent representations is pled with requisite particularity. For example, Allstate specifically alleges that Spektor submitted (and/or caused to be submitted) false and fraudulent legal documentation to Allstate—specifically, stipulations of settlement and other legal documents mailed for the purpose of obtaining settlement proceeds (a portion of which was used to reimburse the defendants for legal services rendered to the healthcare providers)— misrepresenting the true ownership and control of the PC Defendant, and the law firm's eligibility to collect statutory attorney's fees under New York law. The documents attached to the Complaint at Exhibit 2 demonstrate the defendants'—including Spektor's—misrepresentations. All of the documents were mailed by Spektor and/or Lyubronetskaya on behalf of the PC Defendant. *See* C. at Exhibit 2. In each of the stipulations of settlement, it is reported that the legal services were rendered by Tanella. *See id.* Each of the stipulations of settlement further represented that Tanella was the owner of the PC Defendant. *See id.* The representations contained on the stipulations of settlement constitute the representations that Allstate alleges are false. Tanella was never the true owner of the PC Defendant, and as a result, the law firm was never entitled to receive statutory attorney's fees under New York law. But for the defendants' clear misrepresentations, Allstate would have never rendered payment to the PC Defendant. Accordingly, Allstate has met its burden under Fed. R. Civ. P. 9(b) to plead the content of fraudulent billing records attributed to Spektor.

## V.   CONCLUSION

WHEREFORE, for all the foregoing reasons, Allstate respectfully requests an Order

**DENYING** Spektor's motion to dismiss (Docket No. 24).  In the alternative, Allstate requests leave

to amend in the event any portion of the Complaint is deemed insufficient under Rule 12(b)(6) or

Rule 9(b).


Respectfully Submitted,
SMITH & BRINK, P.C.


Richard D. King, Jr. (RK8381)
rking@smithbrink.com
Nathan A. Tilden (NT0571)
ntilden@smithbrink.com
Michael W. Whitcher (MW7455)
mwhitcher@smithbrink.com
1325 Franklin Avenue, Suite 320
Garden City, NY 11530
(347) 710-0050

Attorneys for the Plaintiffs,

*Allstate Insurance Company, Allstate Indemnity Company,*
*Allstate Property and Casualty Insurance Company, and*
*Deerbrook Insurance Company.*


Dated:  May 16 2012

## CERTIFICATE OF SERVICE

I, Michael W. Whitcher, attorney for the Plaintiffs, hereby certify that I have served all parties of record in the above-captioned matter via CM/ECF and/or First Class Mail.

_____
Michael W. Whitcher

Dated: May 16 2012